Filed 12/28/07          NO. 4-06-0894

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| CINDY PLOENSE, Individually and as Special Administrator of the Estate of Michael Ploense, Deceased, | ) ) ) | Appeal from Circuit Court of McLean County |
| Plaintiff-Appellee, | ) | No. 05L202 |
| v. | ) | |
| ELECTROLUX HOME PRODUCTS, INC., et al., | ) | |
| Defendants, | ) | |
| and | ) | |
| THE CHROME COALITION, | ) | |
| Defendant-Appellant. | ) ) ) ) | Honorable James E. Souk, Judge Presiding. |

---

PRESIDING JUSTICE APPLETON delivered the opinion of the court:

In March, 2006, plaintiff, Cindy Ploense, as special administrator of the estate of Michael Ploense, deceased, sued the Chrome Coalition, along with other defendants, for participation in a civil conspiracy to suppress knowledge of the harmful health effects of chrome. The Chrome Coalition specially appeared and moved to dismiss the action against it for lack of personal jurisdiction. In September 2006, the circuit court denied the motion, and the Chrome Coalition petitioned to us for leave to appeal pursuant to Illinois Supreme Court Rule 306(a)(3) (210 Ill. 2d R. 306(a)(3)). We denied the petition. The Chrome Coalition then appealed to the supreme court, which, by supervisory order, directed us to grant the petition and to hear the appeal on its merits. Ploense v. Chrome Coalition, 223 Ill. 2d 684, 862 N.E.2d 1001 (2007)

(nonprecedential supervisory order on denial of petition for leave to appeal).  We have done so.  We conclude that the Chrome Coalition lacks the "minimum contacts" with Illinois necessary to justify the exercise of personal jurisdiction.  See International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158 (1945).  Therefore, we reverse the circuit court's judgment.

## I. BACKGROUND

In count XVI of her amended complaint, plaintiff seeks damages for wrongful death from the Chrome Coalition and five other defendants:  Occidental Chemical Corporation (Occidental); Metropolitan Life Insurance Company; PPG Industries, Inc. (PPG); Elementis Chromium G.P., Inc. (Elementis); and Honeywell International, Inc. (Honeywell).  Therein, she refers to these six defendants as the "[c]onspirators."

Plaintiff pleads the following facts.  From 1973 to 1999 (except for periods when he was laid off), Michael Ploense was employed by a company called Eureka.  He worked at Eureka's plant in Bloomington, Illinois, from 1973 to 1997 and at another Eureka plant in Normal, Illinois, from 1997 to 1999.  Eureka assigned him to work "throughout the plants[,] including within or near the plating department in the Bloomington plant[,] from 1973 to 1984."

During these years, Honeywell, PPG, Occidental, and Elementis (or their corporate predecessors) were in the business of manufacturing and distributing products containing chrome.  The Chrome Coalition was an organization promoting the sale and use of products containing chrome.  Exposure to chrome caused disease and

death. Ploense "was exposed to chrome, including chrome from one or more of the conspirators, during his employment at Eureka," and, as a result, he contracted lung cancer and died. Before Ploense was exposed to chrome in the workplace, the conspirators knew that chrome caused serious disease and death. Ploense, however, lacked such knowledge, and the conspirators knew that workers like him, exposed to chrome in the course of their job duties, were ignorant of its hazardous properties. "Two or more of the [c]onspirators had employees who were exposed to *** chrome," and "[e]ach of the [c]onspirators knew that if it [had] adequately warned its own employees and others whose work brought them into contact with chrome, *** workers [would have left] those industries using chrome[,] *** there[by] reduc[ing] the sale and usage of chrome products."

Plaintiff further alleges as follows:

"20. The [c]onspirators knowingly conspired and agreed among themselves to, among other[] [things]:

(a) assert that which was not true--that it was safe for people to be exposed to chrome and chrome[-]containing materials; [and]

(b) suppress information about the harmful effects of chrome.

21. One or more of the [c]onspirators performed the following overt acts in furtherance of the conspiracy:

(a) sold chrome products which were

- 3 -

used at the [Bloomington and Normal plants] without warning of the hazards known to the conspirators, including sales by Occidental ***, Allied Chemical [Corporation (the predecessor of Honeywell),] and PPG *** to Eureka, from which Michael Ploense was exposed to chrome;

(b) refused to warn its own employees about the hazards of chrome known to it;

(c) suppressed the results of chrome studies conducted by the Industrial Hygiene Foundation [(IHF)] in the 1940s regarding the relationship between chrome and cancer;

(d) agreed not to disclose the results of research on the effects of chrome upon health unless the results suited their interests;

(e) through lobbying and other efforts, attempted to defeat measures by the federal government to regulate the amount of chrome permissible in the breathing zone of workers, suppressed the results of stud[ies] on the effects of chrome, including the [1956 to 1957] study by IHF, and agreed to the non-

dissemination of information linking chrome to disease back to at least the 1940s[;]

(f) exposed its own employees to chrome without warning of the hazards;

(g) refused to warn its employees who were exposed to chrome-containing materials of the hazards of exposure to chrome known to the conspirators; and

(h) misrepresented and suppressed the results of its studies finding a five[]fold increase in lung[-]cancer deaths from low[-]level exposure to chrome[,] from [the Occupational Safety and Health Administration] and other governmental bodies."

Counts XVII and XVIII of the amended complaint make essentially the same allegations against the six defendants, but count XVII adds that Ploense "was ill from lung cancer for a period of time before his death," and count XVIII adds that Ploense was plaintiff's spouse and, because of his injury, plaintiff "suffered a loss of services and society and became obligated for the expense of the medical care and funeral costs for treatment and services provided to her spouse."

In support of its motion for dismissal on the ground of lack of personal jurisdiction, the Chrome Coalition filed an affidavit by its chairman, Joel Barnhart. In

his affidavit, he states as follows. The Chrome Coalition is not a resident of Illinois and has "never engaged in the design, manufacture, marketing, sale, or distribution of any products." Rather, it was founded in 1986 as a voluntary unincorporated trade association with a dual purpose: to "serve as an information clearinghouse that gathers and disseminates information, research, and studies relating to chrome; and to serve as a facilitator of chrome[-]industry comments and opinions concerning regulations affecting chrome." The Chrome Coalition has no employees and only two officers: Barnhart and a vice chairman, Russell J. Morgan. Its membership consists of "various segments of the chromium industry, including manufacturers and producers of chrome and chrome products, distributors of chrome products, users of chrome products, and other trade associations representing users of chrome products." Although its membership includes manufacturers and producers of chromium chemicals and other chromium products, "the Chrome Coalition itself has no financial investment in any of those manufacturers or producers and does not share in their profits." From 1986 to 2003, the Chrome Coalition's affairs were administered by the Industrial Health Foundation, which maintained an office in Pittsburgh, Pennsylvania. Currently, the Chrome Coalition has no physical office. Its affairs "are conducted at meetings held periodically by telephone or at locations where the Chrome Coalition's various members themselves are located. Past meetings of the Chrome Coalition's members have taken place in Pennsylvania, California, and the Washington, D.C.[,] area."

Under the heading "The Chrome Coalition Has No Contacts With the State of Illinois," Barnhart's affidavit avers as follows:

- 6 -

"12. The Chrome Coalition has never engaged in substantial business activities in the State of Illinois[] [and never] has otherwise established or sought to establish a presence in Illinois.

13. The Chrome Coalition has never been qualified or licensed to do business in Illinois; has never maintained or conducted business operations in Illinois; and has never operated, conducted, or engaged in or carried on a business or a business venture in Illinois.

14. The Chrome Coalition does not own, use, possess[,] or hold any mortgage or lien on any real property in Illinois.

15. The Chrome Coalition has no interest in any other property or asset in Illinois. The Chrome Coalition has no property at all, other than various records related to its existence and operations.

16. The Chrome Coalition does not maintain any offices, agencies, bank accounts, telephone lines or listings, post office boxes, mailing address, or other physical presence in Illinois.

17. The Chrome Coalition does not maintain an authorized agent for service of process in Illinois.

18. The Chrome Coalition does not maintain employees or agents in Illinois.

19. The Chrome Coalition has never paid taxes to the State of Illinois.

20. The Chrome Coalition has never advertised in the State of Illinois.

21. The Chrome Coalition has never engaged in promotions in the State of Illinois.

22. The Chrome Coalition has never instituted a legal proceeding of any kind in Illinois.

23. To the best of my knowledge, the Chrome Coalition has never contracted in Illinois, and the Chrome Coalition has never contracted with any person or entity for goods or services in the State of Illinois.

24. The Chrome Coalition has never held a meeting in the State of Illinois.

25. No officer of the Chrome Coalition has ever traveled to Illinois for Chrome Coalition business purposes."

## II. ANALYSIS

### A. Our Standard of Review

The circuit court denied the Chrome Coalition's motion for dismissal without holding an evidentiary hearing. We infer that the court found, in the amended

complaint, a <u>prima</u> <u>facie</u> case of personal jurisdiction unrebutted by Barnhart's affidavit.

Our standard of review is <u>de</u> <u>novo</u>, for when the circuit court hears no testimony and

determines the jurisdictional issue solely on the basis of documents on file, it is in no

better position than we are to assess credibility and weigh the evidence. <u>TCA</u>

<u>International, Inc. v. B & B Custom Auto, Inc.</u>, 299 Ill. App. 3d 522, 531, 701 N.E.2d 105,

112 (1998); <u>Stein v. Rio Parismina Lodge</u>, 296 Ill. App. 3d 520, 523, 695 N.E.2d 518, 521

(1998).

B. Personal Jurisdiction Under the Illinois Long-Arm Statute

Sections 2-209(a)(2) and (c) of the Code of Civil Procedure (Code) provide

as follows:

"(a) Any person, whether or not a citizen or resident

of this [s]tate, who[,] in person or through an agent[,] does

any of the acts hereinafter enumerated[] thereby submits

such person *** to the jurisdiction of the courts of this

[s]tate as to any cause of action arising from the doing of any

of such acts:

***

(2) The commission of a tortious act

within this State[.]

* * *

(c) A court may also exercise jurisdiction on any other

basis now or hereafter permitted by the Illinois Constitution

- 9 -

and the Constitution of the United States." 735 ILCS 5/2-209(a)(2), (c) (West 2006). To find personal jurisdiction under section 2-209(a)(2), the court need not resolve, on the merits, the issue of whether the act was indeed "tortious" as the plaintiff alleges (thereby improperly merging the jurisdictional question with the merits); "'[i]f the defendant or its agent performs an act or omission which causes an injury in Illinois and the plaintiff alleges that the act or omission was tortious in nature, the jurisdictional requirement is satisfied.'" International Business Machines Corp. v. Morton Property & Casualty Insurance Agency, Inc., 281 Ill. App. 3d 854, 859, 666 N.E.2d 866, 869 (1996), quoting 3 R. Michael, Illinois Practice §6.5, at 68 (1989).

According to the amended complaint, it was not the Chrome Coalition but a manufacturer or distributor that actually "commi[tted] [the] tortious [or injury-causing] act" within the territorial boundaries of Illinois, i.e., "sold chrome products which were used at the [Bloomington and Normal plants] without warning of the hazards known to the conspirators." By alleging a conspiracy between the Chrome Coalition and the manufacturer or distributor, plaintiff effectively rules out any agency relationship between the Chrome Coalition and the manufacturer or distributor. "[B]ecause the acts of an agent are considered in law to be the acts of the principal, there can be no conspiracy between a principal and an agent." Buckner v. Atlantic Plant Maintenance, 182 Ill. 2d 12, 24, 694 N.E.2d 565, 571 (1998); see also John Deere Co. v. Metzler, 51 Ill. App. 2d 340, 355, 201 N.E.2d 478, 486 (1964). Thus, the perpetrator of the overt act in Illinois was neither the Chrome Coalition nor an agent of the Chrome

Coalition. It follows that personal jurisdiction is unavailable under section 2-209(a)(2) (735 ILCS 5/2-209(a)(2) (West 2006)).

Section 2-209(c) allows an Illinois court to exercise personal jurisdiction to the fullest extent permitted by the Illinois Constitution and the Constitution of the United States. 735 ILCS 5/2-209(c) (West 2006). We next will explore this broader, constitutional basis of jurisdiction.

## C. The "Outer Limits" of Personal Jurisdiction, as Delineated By <u>International Shoe</u> and Its Progeny

Plaintiff argues that our decision in <u>Cameron v. Owens-Corning Fiberglas Corp.</u>, 296 Ill. App. 3d 978, 695 N.E.2d 572 (1998), is directly on point and requires us to affirm the circuit court's judgment. The Chrome Coalition argues that <u>Cameron</u> is distinguishable and that, if not distinguishable, it is inconsistent with federal standards of due process in the exercise of personal jurisdiction over nonresident defendants. Regardless of whether <u>Cameron</u> is directly on point in its facts, it uses language, in its rationale, that is directly applicable to the present case. For example, the decision states that "[t]he Illinois long-arm statute encompasses the conspiracy theory of jurisdiction." <u>Cameron</u>, 296 Ill. App. 3d at 986, 695 N.E.2d at 577. Because plaintiff invokes the "conspiracy theory of jurisdiction," we must consider the extent to which that theory comports with due process.

"Federal standards are the outer limits beyond which the state may not go to acquire jurisdiction over nonresidents ***." <u>Cameron</u>, 296 Ill. App. 3d at 984, 695 N.E.2d at 576. We look to four decisions by the Supreme Court of the United States as determining the limits of personal jurisdiction.

## 1. International Shoe

In International Shoe, 326 U.S. at 313, 90 L. Ed. at 100, 66 S. Ct. at 157, the appellant was a Delaware corporation engaged in the manufacture and sale of footwear. Its principal place of business was St. Louis, Missouri. The appellant had no office or inventory in the State of Washington. International Shoe, 326 U.S. at 313, 90 L. Ed. at 100, 66 S. Ct. at 157. But it had 11 to 13 salesmen in that state, and they rented rooms in hotels and business buildings, where they exhibited sample shoes and solicited orders from prospective buyers. International Shoe, 326 U.S. at 313-14, 90 L. Ed. at 100, 66 S. Ct. at 157. Their commissions each year for sales in Washington totaled more than $31,000. International Shoe, 326 U.S. at 313, 90 L. Ed. at 100, 66 S. Ct. at 157. The salesmen had no authority to enter into contracts or make collections; they merely transmitted orders to the appellant's office in St. Louis for acceptance or rejection. International Shoe, 326 U.S. at 314, 90 L. Ed. at 100, 66 S. Ct. at 157.

The administrators of the Washington unemployment compensation fund brought an action against the appellant to recover unpaid contributions to the fund. International Shoe, 326 U.S. at 312, 90 L. Ed. at 99, 66 S. Ct. at 156. The appellant contended that its activities within the state were insufficient to manifest its presence there and that Washington's exercise of personal jurisdiction over the appellant consequently violated due process. International Shoe, 326 U.S. at 315, 90 L. Ed. at 101, 66 S. Ct. at 158.

The Supreme Court held that in the case of a defendant (such as the appellant shoe company) that was not present in the state, due process allowed the

state's courts to exercise personal jurisdiction over that defendant only if it "[had] certain minimum contacts with [the state] such that the maintenance of the suit [would] not offend 'traditional notions of fair play and substantial justice.'" International Shoe, 326 U.S. at 316, 90 L. Ed. at 102, 66 S. Ct. at 158, quoting Milliken v. Meyer, 311 U.S. 457, 463, 85 L. Ed. 278, 283, 61 S. Ct. 339, 343 (1940). The contacts of the corporation with the state must be such "as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there. An 'estimate of the inconveniences' which would result to the corporation from a trial away from its 'home' or principal place of business is relevant in this connection." International Shoe, 326 U.S. at 317, 90 L. Ed. at 102, 66 S. Ct. at 158, quoting Hutchinson v. Chase & Gilbert, Inc., 45 F.2d 139, 141 (2d Cir. 1930).

Generally, the amount of contact required depends on whether the activity of the corporation within the state constitutes the basis of alleged liability. The required amount of contact is less if the corporation's activity within the state "give[s] rise to the liabilities sued on." International Shoe, 326 U.S. at 317, 90 L. Ed. at 102, 66 S. Ct. at 159. The required amount of contact is more if the lawsuit "aris[es] from dealings entirely distinct from those [contacts]." International Shoe, 326 U.S. at 318, 90 L. Ed. at 103, 66 S. Ct. at 159.

The test, however, is not "simply mechanical or quantitative" (International Shoe, 326 U.S. at 319, 90 L. Ed. at 103, 66 S. Ct. at 159)--the analysis is not reducible to the mere question of whether the nonresident defendant's activity in the state is "a little more or a little less"--the "quality and nature of the activity" also

count (<u>International Shoe</u>, 326 U.S. at 319, 90 L. Ed. at 103-04, 66 S. Ct. at 159-60). "Whether due process is satisfied must depend *** [on] the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." <u>International Shoe</u>, 326 U.S. at 319, 90 L. Ed. at 104, 66 S. Ct. at 160.

The Supreme Court reasoned:

"[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of[,] or are connected with[,] the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." <u>International Shoe</u>, 326 U.S. at 319, 90 L. Ed. at 104, 66 S. Ct. at 160.

The appellant in <u>International Shoe</u> not only carried on "systematic and continuous" activities in Washington, "result[ing] in a large volume of interstate business, in the course of which [the] appellant received the benefits and protection of the laws of the state" (for example, the laws making it possible to lease real estate), but "[t]he obligation *** sued upon arose out of those very activities"--the payment of income to employees within the state gave rise to a statutory obligation to contribute to the unemployment compensation fund. <u>International Shoe</u>, 326 U.S. at 320, 90 L. Ed.

at 104, 66 S. Ct. at 160. The Supreme Court concluded: "It is evident that these operations establish sufficient contacts or ties with the state of the forum to make it reasonable and just[,] according to our traditional conception of fair play and substantial justice[,] to permit the state to enforce the obligations which [the] appellant ha[d] incurred there." International Shoe, 326 U.S. at 320, 90 L. Ed. at 104, 66 S. Ct. at 160.

### 2. Hanson v. Denckla

Dora B. Donner, a resident of Pennsylvania, executed a trust agreement naming the Wilmington Trust Company of Wilmington, Delaware, as trustee. The corpus of the trust consisted of securities. Hanson v. Denckla, 357 U.S. 235, 238, 2 L. Ed. 2d 1283, 1289, 78 S. Ct. 1228, 1231 (1958). In the trust agreement, Donner reserved a life estate in the corpus and provided that the remainder was to be paid to such persons as she should appoint by inter vivos or testamentary instrument. Hanson, 357 U.S. at 238, 2 L. Ed. 2d at 1289, 78 S. Ct. at 1231. Donner subsequently moved to Florida, where she exercised her inter vivos power of appointment. Hanson, 357 U.S. at 239, 2 L. Ed. 2d at 1289, 78 S. Ct. at 1232.

Because the appointment amounted to a "republication" of the trust instrument that Donner originally executed in Pennsylvania, Florida courts ruled that they had personal jurisdiction over the nonresident Delaware trustee. Hanson, 357 U.S. at 253, 2 L. Ed. 2d at 1297, 78 S. Ct. at 1239. The Supreme Court disagreed. It said:

> "For choice-of-law purposes[,] such a ruling may be
>
> justified, but we think it an insubstantial connection with

the trust agreement for purposes of determining the question of personal jurisdiction over a nonresident defendant. The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum [s]tate. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws. International Shoe v. Washington, 326 U.S. [at] 319, [90 L. Ed. at 104, 66 S. Ct. at 160]. The settlor's execution[,] in Florida[,] of her power of appointment cannot remedy the absence of such an act in this case." Hanson, 357 U.S. at 253-54, 2 L. Ed. 2d at 1297-98, 78 S. Ct. at 1239-40.

### 3. Kulko v. Superior Court of California

Ezra and Sharon Kulko married and had two children, Darwin and Ilsa. Kulko v. Superior Court, 436 U.S. 84, 86-87, 56 L. Ed. 2d 132, 138, 98 S. Ct. 1690, 1694 (1978). The Kulkos and their two children resided together in New York City until March 1972, when the Kulkos separated from one another. Kulko, 436 U.S. at 87, 56 L. Ed. 2d at 138, 89 S. Ct. at 1694. Sharon moved to San Francisco, California, while Ezra

remained in New York City. <u>Kulko</u>, 436 U.S. at 87, 56 L. Ed. 2d at 138, 98 S. Ct. at 1694. A separation agreement provided that the children would remain with their father during the school year but would spend Christmas, Easter, and summer vacations with their mother. <u>Kulko</u>, 436 U.S. at 87, 56 L. Ed. 2d at 138, 98 S. Ct. at 1694. Ezra also agreed therein to pay a certain amount of child support for the periods when the children were in Sharon's custody. <u>Kulko</u>, 436 U.S. at 87, 56 L. Ed. 2d at 138, 98 S. Ct. at 1694. The parties obtained a divorce incorporating the terms of the separation agreement. <u>Kulko</u>, 436 U.S. at 87, 56 L. Ed. 2d at 138, 98 S. Ct. at 1694. In December 1973, just before Ilsa was to leave New York to spend Christmas vacation with her mother, she told her father she wished to remain in California after the vacation. <u>Kulko</u>, 436 U.S. at 87, 56 L. Ed. 2d at 138, 98 S. Ct. at 1694. Ezra acceded to his daughter's wish, and she moved to California to stay permanently with her mother. <u>Kulko</u>, 436 U.S. at 87-88, 56 L. Ed. 2d at 138, 98 S. Ct. at 1694. In January 1976, Darwin called his mother from New York and told her that he, too, wanted to live in California. <u>Kulko</u>, 436 U.S. at 88, 56 L. Ed. 2d at 138, 98 S. Ct. at 1694. Without Ezra's knowledge, Sharon mailed Darwin a plane ticket, and he flew to California, where he took up residence with his mother and sister. <u>Kulko</u>, 436 U.S. at 88, 56 L. Ed. 2d at 138, 98 S. Ct. at 1694.

Less than a month after Darwin's arrival in California, Sharon filed an action against Ezra in the California superior court, seeking to increase his child-support obligation. <u>Kulko</u>, 436 U.S. at 88, 56 L. Ed. 2d at 138-39, 98 S. Ct. at 1694. Ezra specially appeared, arguing he was not a resident of California and he had insufficient contacts with California to justify its exercise of personal jurisdiction over him. <u>Kulko</u>,

436 U.S. at 88, 56 L. Ed. 2d at 139, 98 S. Ct. at 1694-95.  The California courts rejected his jurisdictional challenge because by allowing his daughter to live with her mother in California, he had done two things:  (1) he had caused "an effect" in the state, justifying the state courts' assertion of personal jurisdiction over him in a lawsuit arising from that "effect"; and (2) he had purposefully availed himself of the benefits and protections of the laws of California.  Kulko, 436 U.S. at 89, 56 L. Ed. 2d at 139, 98 S. Ct. at 1695.

The Supreme Court of the United States was unpersuaded by this rationale.  "A father who agrees, in the interests of family harmony and his children's preferences, to allow them to spend more time in California than was required under a separation agreement can hardly be said to have 'purposefully availed himself' of the 'benefits and protections' of California's laws."  Kulko, 436 U.S. at 94, 56 L. Ed. 2d at 142-43, 98 S. Ct. at 1698.  "In light of our conclusion that [Ezra] did not purposefully derive benefit from any activities relating to the [s]tate of California, it is apparent that the California Supreme Court's reliance on [Ezra's] having caused an 'effect' in California was misplaced."  Kulko, 436 U.S. at 96, 56 L. Ed. 2d at 143-44, 98 S. Ct. at 1699.

### 4. World-Wide Volkswagen Corp. v. Woodson

Harry and Kay Robinson, husband and wife, bought a new Audi automobile from Seaway Volkswagen, Inc. (Seaway), in New York.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 288, 62 L. Ed. 2d 490, 495, 100 S. Ct. 559, 562 (1980).  The Robinsons, who resided in New York, decided to move to Arizona.  World-Wide Volkswagen, 444 U.S. at 288, 62 L. Ed. 2d at 495, 100 S. Ct. at 562.  As they

were passing through Oklahoma, another car struck their Audi in the rear, causing the Audi to catch on fire and severely burn Kay Robinson and her two children. World-Wide Volkswagen, 444 U.S. at 288, 62 L. Ed. 2d at 495, 100 S. Ct. at 562. The Robinsons brought a product-liability action in Oklahoma, alleging that their injuries resulted from the defective design and placement of the Audi's gas tank and fuel system. World-Wide Volkswagen, 444 U.S. at 288, 62 L. Ed. 2d at 495, 100 S. Ct. at 562. Among other defendants, they named the retail dealer, Seaway, as well as the regional distributor, World-Wide Volkswagen Corp. (World-Wide). World-Wide Volkswagen, 444 U.S. at 288, 62 L. Ed. 2d at 495-96, 100 S. Ct. at 562. Seaway and World-Wide challenged the Oklahoma court's exercise of personal jurisdiction over them. World-Wide Volkswagen, 444 U.S. at 288, 62 L. Ed. 2d at 496, 100 S. Ct. at 562-63. Oklahoma rejected their challenge, and Seaway and World-Wide appealed to the Supreme Court of the United States. World-Wide Volkswagen, 444 U.S. at 289-91, 62 L. Ed. 2d at 496-97, 100 S. Ct. at 563-64.

The Supreme Court reaffirmed the principle that a state court could exercise personal jurisdiction over a nonresident defendant only if the defendant's contacts with the state were such that it would be reasonable to require the defendant to defend against the lawsuit brought there. World-Wide Volkswagen, 444 U.S. at 291-92, 62 L. Ed. 2d at 498, 100 S. Ct. at 564. With respect to the petitioners, Seaway and World-Wide, the Supreme Court made the following observations:

"[W]e find in the record before us a total absence of those affiliating circumstances that are a necessary predicate

- 19 -

to any exercise of state-court jurisdiction. [The] [p]etitioners carry on no activity whatsoever in Oklahoma. They close no sales and perform no services there. They avail themselves of none of the privileges and benefits of Oklahoma law. They solicit no business there[,] either through salespersons or through advertising reasonably calculated to reach the [s]tate. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market. In short, [the] respondents seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma." World-Wide Volkswagen, 444 U.S. at 295, 62 L. Ed. 2d at 500, 100 S. Ct. at 566.

The Robinsons argued that because an automobile was mobile by its very design and purpose, it was foreseeable to Seaway and World-Wide that the Robinsons' Audi would cause an injury in Oklahoma. World-Wide Volkswagen, 444 U.S. at 295, 62 L. Ed. 2d at 500, 100 S. Ct. at 566. The Supreme Court responded that foreseeability alone was an insufficient benchmark for personal jurisdiction. World-Wide

Volkswagen, 444 U.S. at 295, 62 L. Ed. 2d at 500, 100 S. Ct. at 566. In Hanson, it was foreseeable that the settlor of a Delaware trust would move to Florida and exercise her power of appointment there; and, in Kulko, it was foreseeable that the mother would move to California and the daughter would want to live with her mother. World-Wide Volkswagen, 444 U.S. at 295-96, 62 L. Ed. 2d at 500, 100 S. Ct. at 566. If foreseeability were the criterion of personal jurisdiction, "[e]very seller of chattels would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel." World-Wide Volkswagen, 444 U.S. at 296, 62 L. Ed. 2d at 501, 100 S. Ct. at 566. For instance, a Wisconsin seller of a defective automobile jack could be sued in New Jersey for damage caused there (World-Wide Volkswagen, 444 U.S. at 296, 62 L. Ed. 2d at 500, 100 S. Ct. at 566, citing Reilly v. Phil Tolkan Pontiac, Inc., 372 F. Supp. 1205 (D. N.J. 1974)), or a Florida soft-drink concessionaire could be sued in Alaska for injuries occurring there (World-Wide Volkswagen, 444 U.S. at 296, 62 L. Ed. 2d at 500-01, 100 S. Ct. at 566, citing Uppgren v. Executive Aviation Services, Inc., 304 F. Supp. 165, 170-71 (D. Minn. 1969))--effectively abolishing the limitations on the sovereignty of each state (World-Wide Volkswagen, 444 U.S. at 293-94, 62 L. Ed. 2d at 499, 100 S. Ct. at 565).

Foreseeability was not, in the Supreme Court's view, wholly irrelevant. "But the foreseeability that is critical to due[-]process analysis is not the mere likelihood that a product will find its way into the forum [s]tate. Rather, it is that the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen, 444 U.S. at 297, 62 L.

- 21 -

Ed. 2d at 501, 100 S. Ct. at 567. The manufacturer or distributor must purposefully market its products to the forum state, either directly or indirectly. World-Wide Volkswagen, 444 U.S. at 297, 62 L. Ed. 2d at 501-02, 100 S. Ct. at 567.

The purchase of automobiles in New York, from which Seaway and World-Wide earned substantial revenue, would not have occurred but for the fact that the automobiles could be used in distant states such as Oklahoma. World-Wide Volkswagen, 444 U.S. at 298, 62 L. Ed. 2d at 502, 100 S. Ct. at 568. "However, financial benefits accruing to the defendant from a collateral relation to the forum [s]tate will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that [s]tate." World-Wide Volkswagen, 444 U.S. at 299, 62 L. Ed. 2d at 502, 100 S. Ct. at 568.

D. Factual Differences Between Cameron and the Present Case

In Cameron, 296 Ill. App. 3d at 981-82, 695 N.E.2d at 574-75, the plaintiffs alleged that Charter PLC (Charter) conspired with other defendants to suppress information about the harmful effects of asbestos and that, in furtherance of the conspiracy, they "'sold asbestos which was used at [a] plant [in Illinois] without warning of the hazards.'" Charter specially appeared, contending that the circuit court lacked personal jurisdiction because Charter had no contacts with Illinois and had never engaged in any aspect of the asbestos business, as Charter explained in an affidavit by its secretary, Peter Thwaite. Cameron, 296 Ill. App. 3d at 987-88, 695 N.E.2d at 578-79. We affirmed the circuit court's denial of Charter's motion for dismissal. Cameron, 296 Ill. App. 3d at 989, 695 N.E.2d at 579. In our decision, we regarded the following facts

- 22 -

as important:  "Thwaite's affidavit concedes that until 1979[,] Cape Industries PLC indirectly owned companies that were engaged in the mining and marketing of asbestos[;] that after 1969[,] Charter owned a majority interest in Cape[;] that Charter placed three directors on Cape's board[;] that Cape's managing director and chairman was a member of Charter's board[;] and that Charter and Cape filed consolidated tax returns."  Cameron, 296 Ill. App. 3d at 988, 695 N.E.2d at 579.  Cameron is factually distinguishable from the present case.  The record contains no evidence that the Chrome Coalition ever had any ownership interest, directly or indirectly, in a manufacturer or distributor of chrome products; that it placed directors on the board of any such entity; or that it filed consolidated tax returns with such an entity.

E. The Constitutional Difficulties With Cameron's Sweeping Rationale

In Cameron, 296 Ill. App. 3d at 986, 695 N.E.2d at 577, we stated that "[t]he Illinois long-arm statute encompasses the conspiracy theory of jurisdiction."  By that theory, if one of the coconspirators committed a tortious act in Illinois, the courts of Illinois acquire personal jurisdiction not only over that coconspirator but over the other coconspirators as well.  Cameron, 296 Ill. App. 3d at 990, 695 N.E.2d at 580 (Cook, J., specially concurring) ("it is only necessary that a conspirator perform an unlawful act pursuant to and in furtherance of the conspiracy that causes an injury in Illinois").  As a federal court put it, "'[u]nder Illinois law, jurisdiction over one conspirator is jurisdiction over all.'"  In re Vitamins Antitrust Litigation, 94 F. Supp. 2d 26, 33 (D. D.C. 2000), quoting Lexecon, Inc. v. Milberg Weiss Bershad Specthrie & Lerach, No. 92 c 7768 (N.D. Ill. May 24, 1993) (1993 U.S. Dist. LEXIS 6898, 1993 WL 179789 at *3) ; see

also Textor v. Board of Regents of Northern Illinois University, 711 F.2d 1387, 1393 (7th Cir. 1983) (actions by one coconspirator in Illinois "provide the requisite minimum contacts between the remaining members of the conspiracy and the [forum state]").  We cited Green v. Advance Ross Electronics Corp., 86 Ill. 2d 431, 440-41, 427 N.E.2d 1203, 1208 (1981), for the following proposition:  "[F]or all coconspirators to be subject to Illinois jurisdiction, one coconspirator must have committed a tortious act within Illinois as agent for the other coconspirators."  Cameron, 296 Ill. App. 3d at 985, 695 N.E.2d at 577.

>   In the referenced passage in Green, the supreme court stated as follows:
>
>>   "It is not true that if one conspirator is subject to Illinois jurisdiction[,] so are all the others.  Rather, the theory of jurisdiction based on the acts of a co[]conspirator must be that co[]conspirators are each others' agents; thus[,] the argument would be that when a conspirator commits a tortious act within Illinois[,] he does so as agent for his co-conspirators, who thereby also become subject to this [s]tate's jurisdiction."  Green, 86 Ill. 2d at 440-41, 427 N.E.2d at 1208.

Some 16 years after deciding Green, the supreme court held that no agency relationship could exist between coconspirators (Buckner, 182 Ill. 2d at 24, 694 N.E.2d at 571), effectively scuttling the "theory of jurisdiction" (stated in Green merely for the sake of

- 24 -

description) whereby a coconspirator commits a tortious act in Illinois as agent for his coconspirators."

In Green, the supreme court seemed to express some reservation about the conspiracy theory of jurisdiction. It observed: "The idea of jurisdiction based on the acts of co[]conspirators has been questioned. (Chromium Industries, Inc. v. Mirror Polishing & Plating Co. (N.D. Ill. 1978), 448 F. Supp. 544, 552.)." Green, 86 Ill. 2d at 441, 427 N.E.2d at 1208. In Cameron, immediately after noting the supreme court's apparent statement of reservation and its citation of Chromium Industries, we remarked that "the legislative amendment of section 2-209 of the Code to add what is now subsection (c) effectively overruled the language in Green *** to the effect that a statute worded such as that in Illinois should have a fixed meaning"--as if to suggest that the legislative amendment, by broadening section 2-209 to encompass jurisdiction on any constitutionally permitted basis, had cured the supreme court's concern about the conspiracy theory of jurisdiction. Cameron, 296 Ill. App. 3d at 985, 695 N.E.2d at 577; see also In re Vitamins Antitrust Litigation, 94 F. Supp. 2d at 32 ("Chromium has been effectively overruled by the legislative amendment of section 2-209"). But the federal court's concern in Chromium Industries (and, therefore, the supreme court's concern in Green) was not simply with the limited scope of the preamendment version of section 2-209. The federal court explained:

"Chromium's theory is that if one co[]conspirator

commits an overt act causing tortious injury in Illinois, all

participants in the conspiracy are deemed to have subjected

- 25 -

themselves to the jurisdiction of the Illinois courts. Here the alleged overt act was performed by Mirror alone. Chromium does not point to any overt tortious acts connecting Roll Grinding or Plasma with Illinois. We have already held that these two corporations do not transact business in Illinois. Thus[,] the co[]conspirator theory would permit jurisdiction over defendants with no direct <u>contacts</u> with the forum district.

We cannot subscribe to this theory. Conspiratorial activities having tortious consequences in this district, at least in the amount shown here, are not a sufficient basis for jurisdiction in the absence of any other <u>contacts</u>." (Emphases added.) <u>Chromium Industries</u>, 448 F. Supp. at 552.

See also A. Althouse, <u>The Use of Conspiracy Theory To Establish In Personam Jurisdiction: A Due Process Analysis</u>, 52 Fordham L. Rev. 234, 253 (1983) ("Automatic attribution of contacts upon a showing of conspiracy avoids consideration of the individual defendant's contact with the forum state--the very essence of jurisdiction"); S. Riback, <u>The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction</u>, 84 Colum. L. Rev 506, 510 (1984) ("[The] basic premise [of the conspiracy theory of jurisdiction]--that acts of one conspirator may be attributed to co[]conspirators for jurisdictional purposes--is seriously flawed. The theory looks to

the contacts of the conspiracy with the forum, rather than to the contacts of each conspirator").  The repeated references to "contacts," in the quoted passage from Chromium Industries, are an unmistakable allusion to International Shoe, which the federal court cited, earlier in its decision, for the proposition that "in order to exercise in personam jurisdiction over a non[]resident defendant, due process requires that he have certain 'minimum contacts' with the forum so that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  Chromium Industries, 448 F. Supp. at 550, quoting International Shoe, 326 U.S. at 316, 90 L. Ed. at 102, 66 S. Ct. at 158.  Thus, we must infer, our supreme court was concerned that the conspiracy theory of jurisdiction would allow the exercise of personal jurisdiction over a nonresident defendant who had no minimum contacts with the forum state.  We should be concerned, too.

We find, in the record before us, a "total absence of *** affiliating circumstances" between the Chrome Coalition and the State of Illinois.  World-Wide Volkswagen, 444 U.S. at 295, 62 L. Ed. 2d at 500, 100 S. Ct. at 566.  This nonresident defendant has never purposefully availed itself of the benefits and protections of Illinois laws.  See International Shoe, 326 U.S. at 319, 90 L. Ed. at 104, 66 S. Ct. at 160; Hanson, 357 U.S. at 253, 2 L. Ed. 2d at 1298, 78 S. Ct. at 1240.  That the Chrome Coalition theoretically might derive some benefit from its members' profitable activities in this state (in the vague sense that what is good for the members is good for the association) does not make the Chrome Coalition subject to this state's personal jurisdiction. "[F]inancial benefits accruing to the defendant from a collateral relation with the forum

[s]tate will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that [s]tate." World-Wide Volkswagen, 444 U.S. at 299, 62 L. Ed. 2d at 502, 100 S. Ct. at 568.

Plaintiff alleges that the Chrome Coalition conspired with other defendants to spread false information, to wit, that chrome posed no hazard to human health. Plaintiff does not allege, however, that the Chrome Coalition intended Illinois to be a particular target of this false information; she does not allege any activity that the Chrome Coalition purposefully directed at Illinois. See World-Wide Volkswagen, 444 U.S. at 295, 62 L. Ed. 2d at 500, 100 S. Ct. at 566 ("They solicit no business there *** through advertising reasonably calculated to reach the State"). As both Kulko and World-Wide Volkswagen teach, it is not enough that the Chrome Coalition caused or contributed to an "effect" in Illinois. Kulko, 436 U.S. at 96, 56 L. Ed. 2d at 143-44, 98 S. Ct. at 1699; World-Wide Volkswagen, 444 U.S. at 296, 62 L. Ed. 2d at 500-01, 100 S. Ct. at 566 (foreseeability). "A contact with the forum state will serve to give it jurisdiction only if the defendant himself had control over the choice of the geographical target of his activities and chose to direct his activities at the forum state. That he caused an effect in a certain state is not enough; he must have purposefully aimed at the state in causing that effect." 84 Colum. L. Rev. at 515. According to the amended complaint, the Chrome Coalition merely agreed to let loose some misinformation upon the world. "[T]he mere likelihood that [the misinformation would] find its way into the forum [s]tate" will not subject the Chrome Coalition to the personal jurisdiction of that state. World-Wide Volkswagen, 444 U.S. at 297, 62 L. Ed. 2d at 501, 100 S. Ct. at 567.

- 28 -

Intangible information cannot become the Chrome Coalition's roving agent for service of process any more than a tangible chattel could. See World-Wide Volkswagen, 444 U.S. at 296, 62 L. Ed. 2d at 501, 100 S. Ct. at 566. Allegedly, other coconspirators chose Illinois as a place in which to sell chrome without warning of its dangers. The record appears to contain no evidence that the Chrome Coalition had any agreement with them regarding Illinois. Other coconspirators, not the Chrome Coalition, purposefully directed their activities at Illinois. "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum [s]tate." Hanson, 357 U.S. at 253, 2 L. Ed. 2d at 1298, 78 S. Ct. at 1239-40.

This is not to say that the Chrome Coalition is immune from liability for civil conspiracy--any more than Seaway and World-Wide were immune from liability for the alleged defect in their product. Plaintiff must enforce that liability, however, in the correct forum--a forum with which the Chrome Coalition has sufficient jurisdictional contacts. "It is elementary that the fact of liability does not confer jurisdiction[;] yet[,] by endowing a conspiracy with an independent jurisdictional significance, the conspiracy theory does just that." 84 Colum. L. Rev. at 510. "The requirements of International Shoe *** must be met as to each defendant over whom a state court exercises jurisdiction." Rush v. Savchuk, 444 U.S. 320, 332, 62 L. Ed. 2d 516, 527, 100 S. Ct. 571, 579 (1980). There is no shortcut, and there is no substitute, for the analysis required by International Shoe and its progeny. "[A] court should look at each defendant's activities. If a conspirator's actions were purposefully aimed at the

forum, then jurisdiction is present.  If not, assertion of jurisdiction would be unconstitutional, even though liability might attach under the substantive law of conspiracy." (Emphasis omitted.) 84 Colum. L. Rev. at 524.

## III. CONCLUSION

For the foregoing reasons, we reverse the circuit court's judgment.

Reversed.

MYERSCOUGH and TURNER, JJ., concur.