605 F.Supp.2d 1118 (2009)
In Re: WESTERN STATES WHOLSALE NATURAL GAS ANTITRUST LITIGATION.
Arandell Corp., et al., Plaintiffs,
v.
Xcel Energy, Inc., et al., Defendants.
MDL No. 1566. Nos. 2:03-CV-01431-PMP-PAL, 2:07-CV-01019-PMP-PAL.
United States District Court, D. Nevada.
February 26, 2009.
*1124 Joshua D. Snyder, Michael J. Boni, Kate Reznick, Theresa J. Henson, Boni & Zack LLC, Bala Cynwyd, PA, Kathleen S. Rogers, Glancy Binkow & Goldberg LLP, Michael P. Lehmann, Cohen, Milstein, Hausfeld & Toll P.L.L.C., San Francisco, CA, Bruce Alverson, Nathan Reinmiller, Alverson Taylor Mortensen & Sanders, Von S. Heinz, Lewis & Roca, LLP, Las Vegas, NV, Marc H. Edelson, Jerold B. Hoffman, Hoffman & Edelson, LLC, Doylestown, PA, Dennis J. Stewart, Hulett Harper Stewart LLP, San Diego, CA, William Timothy Needham, Janssen, Malloy, Needham, Morrison, Reinholtsen & Crowley, LLP, Eureka, CA, Alan J. Mandel, Alan J. Mandel, Ltd., Skokie, IL, Ira P. Gould, Jeffrey S. Torosian, Paul Alexis Del Aguila, Paul T. Fox, Howard K. Jeruchimowitz, Greenberg Traurig, LLP, Gary D. McCallister, Gary D. McCallister & Associates, Ltd, Chicago, IL, Gregory M. Bentz, Kathleen A. Hardee, Jennifer Gille Bacon, Dennis D. Palmer, Russell S. Jones, Jr., Polsinelli Shughart, P.C., R. Lawrence Ward, Shughart Thomson & Kilroy, PC, Cathy J. Dean, Douglas Kramer, Polsinelli Shalton Flanigan Suelthaus, Kansas City, MO, Donald D. Barry, Barry Law Offices, L.L.C., Eric I. Unrein, Davis, Unrein, Biggs & Head, L.L.P., Topeka, KS, Gregory L. Musil, Shughart Thompson & Kilroy, Isaac Diel, Sharp McQueen P.A., Overland Park, KS, Philip Wayne Bledsoe, Shughart Thomson & Kilroy, PC, Denver, CO, Robert L. Gegios, William E. Fischer, Kohner, Mann & Kailas, Milwaukee, WI, R. Dan Boulware, Shughart Thompson & Kilroy, *1125 PC, St. Joseph, MO, Matthew C. Hans, S. Jay Dobbs, Polsinelli Shalton Flanigan Suelthaus, St. Louis, MO, Matthew Corcoran, Melvin Goldstein, Goldstein & Associates, PC, Washington, DC, Philip M. Ballif, Durham Jones & Pinegar, Salt Lake City, UT, Thomas H. Brill, Law Office of Thomas H. Brill, Mission Hills, KS, for Plaintiffs.
Stacy Williams, Locke Lord Bissell & Liddell LLP, Amy E. Tabor, Mark R. Robeck, Baker Botts L.L.P, Jefferson Gregory Copeland, Houston, TX, Khai Lequang, William Molinski, Orrick, Herrington & Sutcliffe, LLP, Michelle B. Goodman, Steven A. Ellis, Mark E. Haddad, Sidley Austin LLP, Joshua D. Lichtman, Fulbright & Jaworski, L.L.P., Kristen Bird, Marshall M. Searcy, Roxanna Manuel, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Michael John Miguel, Morgan, Lewis & Bockius LLP, Richard P. Levy, Gibson, Dunn & Crutcher LLP, Alan Z. Yudkowsky, Peter F. Jazayeri, Brian J. Nese, Stroock & Stroock & Lavan LLP, Jodi K. Stanfield, Los Angeles, CA, Martin M. Loring, Blackwell, Sanders, Peper, Martin, Jerome T. Wolf, Sonnenschein Nath & Rosenthal LLP, James Richard Eiszner, Lori Renee Schultz, Shook, Hardy & Bacon LLP, W. James Foland, Foland, Wickens, Eisfelder, Roper & Hofer, P.C., Thomas P. Schult, Stacey R. Gilman, Berkowitz, Oliver, Williams, Shaw & Eisenbrandt, LLP, Kansas City, MO, Glen G. Reid, Jr., Robert E. Craddock, Jr., Wyatt, Tarrant & Combs, LLP, Paul Howard Morris, Martin Tate Morrow & Marston, Memphis, TN, Joel B. Kleinman, Lisa M. Kaas, Adam Proujansky, Dickstein Shapiro LLP, Washington, DC, Bruno William Katz, Shea Stokes & Carter, ALC, Christopher J. Healey, Jeffrey D. Wexler, Luce, Forward, Hamilton & Scripps LLP, San Diego, CA, Douglas R. Tribble, Michael J. Kass, John M. Grenfell, Pillsbury Winthrop Shaw Pittman LLP, Terry Houlihan, Bingham McCutchen LLP, San Francisco, CA, Barry S. Hyman, Samantha C. Norris, William M. Hannay, Schiff Hardin LLP, Chicago, IL, Paul R. Norman, Boardman, Suhr, Curry & Field LLP, James W. Richgels, Quarles & Brady, LLP, Bruce A. Schultz, Madison, WI, Kelly H. Twigger, Quarles & Brady LLP, Milwaukee, WI, David Len Bryant, Bryant Law Firm, Oliver S. Howard, Amelia A. Fogleman, Craig A. Fitzgerald, Mason G. Patterson, Scott R. Rowland, Gable & Gotwals, Graydon Dean Luthey, Jr., Sarah Jane Gillett, Brandon B. Rule, Heather L. Cupp, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, Jennifer Dorsey, Kemp, Jones & Coulthard, LLP, J. Randall Jones, Harrison, Kemp & Jones, LLP, William R. Urga, Jolley Urga Wirth Woodbury & Standish, Las Vegas, NV, James E. Scarboro, Jessica Brody, Matthew Douglas, Arnold & Porter LLP, Denver, CO, Thomas F. Reese, Brown, Drew & Massey, LLP, Casper, WY, for Defendants.
Charles A. Moore, Dewey & Leboeuf LLP, Houston, TX, Susan G. Kupfer, Sylvie K. Kern, Glancy Binkow & Goldberg, LLP, San Francisco, CA.

ORDER RE: DEFENDANT'S MOTION TO DISMISS (Doc. # 869)
PHILIP M. PRO, District Judge.
Presently before this Court is Defendant Reliant Energy, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. # 869),[1] filed on March 3, 2008. Plaintiffs filed an Opposition (Doc. # 1103) and supporting declaration (Doc. # 1104) on June *1126 4, 2008. Defendant Reliant Energy, Inc. filed a Reply (Doc. # 1185) on June 24, 2008.

I. BACKGROUND

A. Procedural Background
This case is one of many in consolidated Multidistrict Litigation arising out of the energy crisis of 2000-2001. Plaintiffs originally filed this action in the Circuit Court, Dane County, Wisconsin. (Notice of Removal [Doc. # 2 in 2:07-CV-01019-PMPAL], Compl.) Defendants removed the case to the United States District Court for the District of Wisconsin. (Id.) The Judicial Panel on Multidistrict Litigation entered a Transfer Order pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.
Plaintiffs Arandell Corporation, Merrick's, Inc., Safety-Kleen Systems, Inc., Sargento Foods, Inc., and Ladish Co., Inc. are Wisconsin corporations. (Corrected Second Am. Compl. [Doc. # 190 in 2:07-CV-01019-PMP-PAL][2] at 5-6.) According to the Corrected Second Amended Complaint ("SAC"), Defendants are natural gas companies that buy, sell, transport, and store natural gas, including their own and their affiliates' production, in the United States and in the State of Wisconsin. (Id. at 6-51.) In this litigation, Plaintiffs allege Defendants conspired to engage in anti-competitive activities with the intent to manipulate and artificially increase the price of natural gas for consumers. (Id.) Specifically, Plaintiffs allege Defendants, directly and through their affiliates, conspired to manipulate the natural gas market by knowingly delivering false reports concerning trade information to trade indices and engaging in wash trades, in violation of Wisconsin Statutes chapter 133. (Id.)
The SAC asserts two causes of action. Count one arises under Wisconsin Statutes § 133.14, which voids contracts to which an antitrust conspirator is a party and allows recovery of payments made pursuant to such a contract. (Id. at 54-56.) Count two seeks trebled actual damages under Wisconsin Statutes § 133.18 for Defendants' alleged antitrust violations. (Id. at 56-57.)
The SAC's allegations are directed generally at two types of Defendants: the natural gas companies that actually engaged in natural gas sales and the related reporting of allegedly manipulated gas prices to the trade indices, and those companies' parent corporations. The SAC does not allege the parent company Defendants themselves engaged in natural gas trading and price reporting. Rather, the SAC alleges these Defendants are the parent companies of subsidiaries which engage in such activity generally, and which also made natural gas sales in Wisconsin during the relevant time period.
Plaintiffs seek to establish personal jurisdiction over the parent company Defendants based on their out-of-forum activities directed at Wisconsin along with their subsidiaries' and affiliates' contacts within Wisconsin. According to the SAC, the parent company Defendants dominated and controlled their respective subsidiaries and the parent company Defendants "entered into a combination and conspiracy... which tended to prevent full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas." (Id. at 6-7, 9, 14-15, 18-19, 23, 26-27, 30-31, 35-36.) Plaintiffs allege the parent *1127 company Defendants intended their actions to have a direct, substantial, and foreseeable effect on commerce in the State of Wisconsin. (Id. at 7, 10, 15, 19, 23-24, 27, 31, 36.) According to the SAC, the parent company Defendants "made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates ... in the United States and in Wisconsin." (Id. at 8, 10, 15, 19, 24, 27-28, 32, 36.)
Defendant Reliant Energy, Inc. ("REI") now moves to dismiss, arguing this Court lacks personal jurisdiction over REI. According to REI, it conducts no business in Wisconsin and has no other contacts supporting general or specific jurisdiction. REI also argues it cannot be subject to jurisdiction in Wisconsin based on its subsidiary's contacts with the forum because its subsidiary is not its agent or alter ego, and Wisconsin would not support the conspiracy theory of jurisdiction. REI thus argues personal jurisdiction does not exist under the Wisconsin long-arm statute, and even if it did, exercising personal jurisdiction in this case would violate constitutional due process requirements.
Plaintiffs respond that REI's subsidiary has submitted to jurisdiction in Wisconsin and REI is subject to personal jurisdiction based on agency and alter ego principles based on its subsidiary's contacts. Additionally, Plaintiffs argue that because Wisconsin's antitrust statutes contemplate imposing liability on an antitrust conspirator who performs acts outside of Wisconsin that have an impact in Wisconsin, the Court has personal jurisdiction over REI under Wisconsin's long-arm statute.

B. Facts Related to Personal Jurisdiction
Defendant REI is a Delaware corporation with its principal place of business in Texas. (Def. Reliant Energy, Inc.'s Mot. to Dismiss for Lack of Pers. Juris. (Doc. # 869), Ex. A ["Jines Decl."] at 2.) REI as it currently exists came into being in response to changes in Texas regulatory laws. (Id.) The company formerly known as Reliant Energy, Incorporated divided itself into CenterPoint Energy, Inc. ("CenterPoint") and Reliant Resources, Inc. ("RRI"). (Id.) After CenterPoint divested itself of its RRI stock, the two companies became separate entities and RRI changed its name to REI, the Defendant in this action. (Id. at 2-3.) Under the Master Separation Agreement resulting in RRI's existence as a separate entity, RRI agreed that it would indemnify, defend, and hold harmless Reliant Energy, Incorporated, and in certain cases, that it would cause its subsidiaries to do so as well, for liabilities arising out of RRI and its subsidiaries' business operations, including business operations that pre-dated the agreement. (App. of Docs. Filed Under Seal ["Sealed App."] (Doc. # 1126), Ex. E at REILJ012883, Ex. F at REILJ009719.)
REI is a holding company that does not itself buy, sell, or transport natural gas, nor does it report natural gas prices to any price reporting firms or price index publishers. (Jines Decl. at 3-4; Joint Supplemental Mem. of Defs. CMS Energy Corp., Duke Energy Carolinas, LLC, and Reliant Energy, Inc. in Supp. of Mots. to Dismiss for Lack of Pers. Juris. (Doc. # 963), Reliant Energy, Inc.'s App. in Supp. of Its Mots. to Dismiss for Lack of Pers. Juris. ["REI App."], Ex. B at 2.) REI does not have any offices, employees, property, bank accounts, phone listings, or mailing addresses in Wisconsin. (Jines Decl. at 3; REI App., Ex. C at 2, Ex. D at 2, Ex. E at *1128 2.) REI does not pay taxes in Wisconsin and has never sold or traded natural gas in Wisconsin. (Jines Decl. at 3; REI App., Ex. B at 2, Ex. F at 2.) REI has not itself conducted any business in Wisconsin. (Jines Decl. at 3.) Other than advertising in publications available nationwide, REI has not directed advertising specifically towards Wisconsin. (REI App., Ex. G at 2.)
REI has a wholly owned subsidiary, Reliant Energy Services, Inc. ("RES"). (Jines Decl. at 3.) RES sold millions of dollars worth of natural gas to the Wisconsin Public Service Corporation and Integrys Energy Services, Inc., Wisconsin corporations, and had a natural gas supply agreement with the Wisconsin Electric Power Company ("WEPCO") and Wisconsin Gas, LLC, during the 2000 to 2002 time period. (Decl. of Andy Hess (Doc. # 1089); Revised Decl. of Kristie J. Wiegand, Revised Decl. of Julie Baumgart (Doc. # 1131); Notice of Filing of Docs. Under Seal (Doc. # 1180); Notice of Filing of Docs. Under Seal (Doc. # 1184); Decl. of Timothy J. McCollow (Doc. # 993); Decl. of William E. Fischer (Doc. # 1097), Second Decl. of James H. Voss.) State of Wisconsin billing records show RES also sold thousands of dollars of natural gas from July 2001 to June 2002 to the State of Wisconsin. (Decl. of William E. Fischer (Doc. # 1104) ["Fischer Decl."], Ex. B, Jines Ex. 16.) Plaintiff Ladish Co., Inc. ("Ladish") purchased over $19 million in natural gas from RES between January 2000 and August 2002. (Id., Jines Ex. 11.)
According to Ladish's accounting manager, RES marketed itself under the name "Reliant Energy" in making these sales. (Id.) Timothy J. McCollow ("McCollow"), a former WEPCO employee, likewise avers that Reliant-related companies sold gas to WEPCO using a common logo. (Decl. of Timothy J. McCollow at 4.) McCollow avers that several Reliant marketing employees traveled to Wisconsin and personally met with WEPCO employees, including McCollow. (Id.) McCollow also states that he and his co-workers spoke with Reliant marketing personnel on a nearly daily basis when WEPCO actively was seeking to purchase natural gas. (Id.)
REI and RES share physical offices in Texas. (Sealed App., Ex. D at 163-64.) REI and its subsidiaries, including RES, share some common officers and directors. (Sealed App., Ex. B.) For example, Michael Jines ("Jines") was an officer for REI, RES, and several other REI subsidiaries, including some for which he could not recall the subsidiary's name. (Sealed App., Ex. D at 15-19, 107-110.) At his deposition, Jines stated his duties and responsibilities as an officer and director of those subsidiaries would be "no different" than his duties and responsibilities as REI's general counsel. (Id. at 119-20.) As RES's one hundred percent owner, REI nominates and elects the directors for RES. (Id. at 88-89.)
At the present time, REI and RES have no employees of their own. (Id. at 248, 288-89.) Rather, Reliant Energy Corporate Services ("RECS"), an REI subsidiary, acts as the payroll entity for REI and all of its subsidiaries. (Id. at 9-10.) RECS employs personnel who provide services to REI and RES. (Id. at 10.) For example, lawyers employed by RECS provide legal services to REI and all of its subsidiaries. (Id. at 111-13.) RECS also provides accounting, finance, legal, human resources, and facilities management services to REI and its subsidiaries. (Id. at 20.) As part of these services, RECS prepares separate financial documents, including tax filings, for RES. (Id. at 56-57, 267.)
In terms of financial dealings between REI and its subsidiaries, the subsidiaries are funded by borrowing from or receiving equity capital infusions from REI. (Id. at 239-40.) In turn, REI receives either loan *1129 repayments or dividends when money is transferred from the subsidiaries to REI. (Id. at 291-92.) In some circumstances, REI provides guarantees to third parties in transactions involving REI subsidiaries. (Id. at 204-05.) REI agreed to be RES's guarantor in an agreement in 2001 with a Wisconsin company. (Fischer Decl., Jines Ex. 17.) In setting forth its financial guarantee policy, REI (then RRI) described RES as a "business unit." (Sealed App., Ex. H at REILJ010083.)
Although describing itself as a holding company, REI does not passively hold stock in its subsidiaries and leave them to operate on their own. Rather, REI establishes overall policies and guidelines for its subsidiaries, establishes a capital structure, and issues consolidated financial reports. (Sealed App., Ex. D at 131.) Among the guidelines REI requires its subsidiaries to follow is a policy for best principles and practices. (Sealed App., Ex. I at REILJ012703.) This policy requires compliance with applicable laws and regulations, and requires that all transactions be for a bona fide business purpose and be reported accurately. (Id.) The best practices policy prohibits wash sales and fictitious transactions. (Id. at REILJ012704.) This policy applied to RES during the relevant period. (Sealed App., Ex. N at 93.)
Additionally, REI sets certain risk control limits on its subsidiaries. For example, REI set limits on RES's value at risk ("VAR"). (Sealed App., Ex. F at REILJ009749.) REI's board of directors sets the overall limit on VAR. (Id.) The Audit Committee of REI's board meets at least three times a year to approve the risk control organization structure, approve the overall risk control policy, monitor compliance with trading limits, and review risk control issues. (Id. at REILJ009752.)
REI also has a Risk Oversight Committee consisting of REI and subsidiary officers which allocates VAR to various business segments, including RES. (Sealed App., Ex. M at 17, Ex. F at REILJ009752.) The Risk Oversight Committee meets at least monthly to monitor compliance, review daily position reports for trading and marketing activity, recommend to REI's board of directors adjustments to trading limits, approve new trading activity, monitor information systems related to risk management, and place guidelines and limits on hedging activity. (Sealed App., Ex. F at REILJ009752-53.) Management for each business segment then allocates risk limits among individual traders within the limits set by the Risk Oversight Committee. (Id. at REILJ009754.) RES allocates VAR to its "head book traders" who in turn authorize other traders to execute trades. (Sealed App., Ex. M at 17.) Thus, the VAR limit set by REI was "an overall limit." (Sealed App., Ex. N at 155.) RES would engage in multiple transactions in one day, and the limit set by REI was evaluated against the net result of a set of RES's transactions or activities. (Id.)
REI oversight of its subsidiaries includes daily reporting of mark-to-market valuation,[3] VAR, and "other risk measurement metrics." (Sealed App., Ex. L.) RES's VAR is reported daily to REI's Risk Oversight Committee. (Sealed App., Ex. M at 17.) Additionally, violations of any risk limits are reported to the business segment management as well as to the appropriate committees. (Sealed App., Ex. F at REILJ009754.) While the reports from the subsidiary to the various committees *1130 may occur daily, communications from REI down to the subsidiaries occurs "only to the extent that the activity ended up in a violation." (Sealed App., Ex. N at 156.) For example, if RES exceeded its VAR limit, an REI officer may inform RES management and inquire as to what RES management intended to do to correct the situation. (Id.) However, "in terms of the day-to-day buying and selling of gas or power, [REI officers have] limited or no interaction." (Id.)
In November 2003, the Commodity Futures Trading Commission ("CFTC") entered into a settlement with RES regarding the CFTC's allegations that RES violated the Commodities Exchange Act. (Fischer Decl., Ex. B, Jines Ex. 4.) According to the settlement, the CFTC found RES's Houston offices made false price reports regarding natural gas transactions from 1999 through May 2002. (Id. at 4-5.) Additionally, the CFTC found RES engaged in wash trades in 2000. (Id. at 6-7.) As part of the settlement, RES and REI agreed to entry of the order finding violations, as well as requiring RES to cease and desist from its misconduct, imposing an $18 million civil penalty on RES, and requiring RES and REI to undertake certain activities. (Id. at 7-9.) Specifically, REI agreed to cooperate with the CFTC in the future, including preserving and producing records regarding the reporting of price or trade volumes in natural gas transactions and producing RES and REI employees to provide assistance in any trial, proceeding, or investigation related to the CFTC's investigation. (Id. at 8-9.) Additionally, REI agreed not to make any public statements denying the CFTC's findings in the order. (Id. at 9.) Jines represented both RES and REI relating to the CFTC's investigation and the terms of the CFTC's order. (Sealed App., Ex. D at 41-44.)
The parties now dispute the significance of these contacts under the Wisconsin long-arm statute. The parties also dispute whether this Court's exercise of personal jurisdiction over REI would violate constitutional due process requirements.

II. PERSONAL JURISDICTION
"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir.2006). To meet this burden, a plaintiff must demonstrate that personal jurisdiction over a defendant is (1) permitted under the applicable state's long-arm statute and (2) that the exercise of jurisdiction does not violate federal due process. Id. The Court must analyze whether personal jurisdiction exists over each defendant separately. Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1130 (9th Cir.2003).
Where the issue is before the Court on a motion to dismiss based on affidavits and discovery materials without an evidentiary hearing, the plaintiff must make "a prima facie showing of facts supporting jurisdiction through its pleadings and affidavits to avoid dismissal." Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1119 (9th Cir.2002). The Court accepts as true any uncontroverted allegations in the complaint and resolves any conflicts between the facts contained in the parties' evidence in the plaintiff's favor. Id. However, for personal jurisdiction purposes, a court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." Alexander v. Circus Circus Enters., Inc., 972 F.2d 261, 262 (9th Cir.1992) (quotation omitted).
*1131 In diversity cases such as this, "a federal court applies the personal jurisdiction rules of the forum state provided the exercise of jurisdiction comports with due process." Scott v. Breeland, 792 F.2d 925, 927 (9th Cir.1986). However, "federal law is controlling on the issue of due process under the United States Constitution." Data Disc, Inc. v. Sys. Tech. Assoc., Inc., 557 F.2d 1280, 1286 n. 3 (9th Cir.1977); see also Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1110 (9th Cir.2002). Therefore, the Court will apply law from the United States Court of Appeals for the Ninth Circuit in deciding whether jurisdiction is appropriate under the Due Process Clause. See In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1174 (D.C.Cir. 1987) (concluding that "the transferee court [should] be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit"); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir.1993) (holding that "a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit").
To satisfy federal due process standards, a nonresident defendant must have "minimum contacts" with the forum state so that the assertion of jurisdiction does not offend traditional notions of fair play and substantial justice. Pebble Beach Co., 453 F.3d at 1155 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 315, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). A federal district court may exercise either general or specific personal jurisdiction. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).
To establish general personal jurisdiction, the plaintiff must demonstrate the defendant has sufficient contacts to "constitute the kind of continuous and systematic general business contacts that `approximate physical presence.'" Glencore Grain, 284 F.3d at 1124 (quoting Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir.2000), modified, Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1207 (9th Cir.2006)). Courts consider such factors as whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there. Bancroft, 223 F.3d at 1086. "[A] defendant whose contacts are substantial, continuous, and systematic is subject to a court's general jurisdiction even if the suit concerns matters not arising out of his contacts with the forum." Glencore Grain, 284 F.3d at 1123 (citing Helicopteros, 466 U.S. at 415 n. 9, 104 S.Ct. 1868).
A nonresident defendant's contacts with the forum state may permit the exercise of specific jurisdiction if: (1) the defendant has performed some act or transaction within the forum or purposefully availed himself of the privileges of conducting activities within the forum, (2) the plaintiff's claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction over the defendant is reasonable. Pebble Beach Co., 453 F.3d at 1155-56. "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir.1995).
Under the first prong of the "minimum contacts test," the plaintiff must establish either that the defendant "(1) purposefully availed himself of the privilege of conducting his activities in the forum, or (2) purposefully directed his activities toward the forum." Pebble Beach Co., 453 F.3d at 1155. "Evidence of availment is typically action taking place in the forum that invokes the benefits and protections *1132 of the laws in the forum." Id. Evidence of direction usually consists of conduct taking place outside the forum that the defendant directs at the forum. Id. at 1155-56.
The purposeful direction aspect of the first prong is satisfied when a foreign act is both aimed at and has effect in the forum. Id. In other words, the defendant "must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." Id. To satisfy the third element of this test, the plaintiff must establish the defendant's conduct was "expressly aimed" at the forum; a "mere foreseeable effect" in the forum state is insufficient. Id. The "express aiming" requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct "individually targeting a known forum resident." Bancroft, 223 F.3d at 1087.
The second prong of the specific jurisdiction test requiring that the contacts constituting purposeful availment or purposeful direction give rise to the current action is measured in terms of "but for" causation. Id. at 1088. "If the plaintiff establishes both prongs one and two, the defendant must come forward with a `compelling case' that the exercise of jurisdiction would not be reasonable." Boschetto v. Hansing, 539 F.3d 1011, 1016 (9th Cir.2008) (quotation omitted).
No evidence in the record demonstrates REI itself had any contacts with Wisconsin other than acting as a guarantor on a single contract between RES and a Wisconsin entity. A single contact does not support general jurisdiction. Plaintiffs' claims do not arise out of that contract and thus specific jurisdiction also does not exist based on this single contact. Consequently, REI is subject to personal jurisdiction in Wisconsin only if the forum acts of its subsidiary, RES, are attributable to it through principles of alter ego, agency, or a conspiracy theory of personal jurisdiction.[4]

A. Alter Ego
A "parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes." Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134. However, a subsidiary's contacts may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's alter ego. Id.
To demonstrate a parent and its subsidiary are alter egos, the plaintiff must establish a prima facie case that the two companies share "such unity of interest and ownership" that the companies' separateness no longer exists and "failure to disregard [their separate identities] would result in fraud or injustice." Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001) (quotation omitted). To demonstrate a unity of interest warranting disregard of corporate separateness, the plaintiff must show the parent controls its subsidiary to such a degree as to render the subsidiary a "mere instrumentality" of its parent. Id. (quotation omitted). Typically, this would involve showing the parent controls the subsidiary's internal affairs or daily operations. Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir.1980).[5]
*1133 A parent corporation may be involved directly in certain aspects of its wholly owned subsidiary's affairs without subjecting itself to alter ego status. For example, a parent may provide financing to its subsidiary so long as it maintains corporate formalities and properly documents loans and capital contributions to its subsidiaries, and it may act as its subsidiary's guarantor. Doe, 248 F.3d at 927-28. Additionally, a parent may refer to its subsidiaries as divisions of the parent in annual reports. Id. at 928. Further, a parent may review and approve major decisions, place its own directors on the subsidiary's board, and share offices and staff with its wholly owned subsidiary without being considered its alter ego. Id.; Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135.
In sum, a parent may involve itself directly in its subsidiary's activities without becoming an alter ego "so long as that involvement is consistent with the parent's investor status." Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135 (quotation omitted). Activities consistent with investor status include "`monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]'" Doe, 248 F.3d at 926 (quoting United States v. Bestfoods, 524 U.S. 51, 72, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)).
In addition to showing lack of corporate separateness, the plaintiff also must show that failure to disregard the corporate form would promote fraud or injustice. The fraud or injustice must relate to the forming of the corporation or abuse of the corporate form, not a fraud or injustice generally. Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 524-25 n. 12 (9th Cir.1984). For example, undercapitalization at the subsidiary's inception may be evidence of the parent's fraudulent intent. Id. However, a corporation that once was capitalized adequately but "subsequently fell upon bad financial times" does not support a finding of fraud or injustice. Id. at 525. Further, evidence that the corporation existed as an ongoing enterprise engaged in legitimate business suggests no fraudulent intent or injustice to support piercing the corporate veil. Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105, 1113 (9th Cir.1979). An inability to collect on a judgment "does not, by itself, constitute an inequitable result." Id.
Plaintiffs have failed to establish a prima facie case of personal jurisdiction based on RES being REI's alter ego. REI provided financing to RES and in return received loan repayments and/or dividends, but no evidence in the record suggests REI failed to maintain corporate formalities or to properly document these loans and capital contributions. Rather, the evidence indicates RECS prepared separate books and records for RES and REI.
REI's conduct in acting as a guarantor for RES also does not support an alter ego finding, and the evidence presented on this point suggests the opposite. REI had in place specific policies regarding when it would consider acting as its subsidiary's guarantor, suggesting that the two corporations and their counterparties viewed the two as separate entities not liable for the *1134 other's obligations except where they contractually agreed to such an arrangement. Further, REI's reference to RES as a "business unit" in a report does not suggest RES was REI's mere instrumentality. Nor does the fact that the two companies shared office space and staff.
REI's oversight of RES is consistent with the parent's investor status. As one hundred percent owner of RES's shares, REI was entitled to nominate and elect RES's board of directors. Additionally, REI is entitled as an investor to monitor RES's performance. Consequently, the daily reporting of information from RES to REI is consistent with REI's investor oversight role. Although REI received daily reporting from RES, no evidence suggests REI gave daily control commands to RES. Rather, the record demonstrates that, consistent with its investor status, REI set general policies and guidelines regarding best policies and practices, as well as certain overall limits, such as the limit on VAR. However, when it came to RES's day-to-day conduct of its business within these guidelines, REI had little to no role. For example, with respect to natural gas trading, while REI set overall limits on certain metrics, REI had no role in making the day-to-day decisions of who RES was to trade with, when, for what amount of natural gas, and at what price. Only when RES exceeded REI's overall limits would REI become involved by inquiring of its subsidiary what it intended to do to correct any violations. Plaintiffs also present no evidence REI had any role in RES's price reporting to indices.
Even if Plaintiffs had established a lack of corporate separateness, Plaintiffs have not established a fraud or injustice would result if the Court failed to pierce the corporate veil. Plaintiffs contend it would be unjust to permit REI to reap the benefits of RES's alleged unlawful behavior by enjoying profits from RES's trading activities while escaping liability for RES's alleged misconduct. However, the alleged illegal price manipulation cannot itself constitute the fraud or injustice necessary to pierce the corporate veil. Rather, REI must have had some fraudulent intent at RES's inception or some later abuse of the corporate form such that failing to treat the entities as one would be inequitable. Plaintiffs present no evidence RES was undercapitalized at its inception. Further, the fact that RES operated as a legitimate business for years suggests a lack of fraudulent intent or perpetration of a fraud through use of the corporate structure on the parent's part.
Plaintiffs' fear that they may not be able to collect on a judgment in this action against RES does not constitute fraud or injustice to support piercing the corporate veil. The Court therefore finds Plaintiffs have not met their burden of establishing RES is REI's alter ego, and the Court will not attribute RES's contacts with Wisconsin to REI for purposes of determining personal jurisdiction based on alter ego principles.

B. Agency
A subsidiary's contacts also may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's general agent in the forum. Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134. A subsidiary is its parent's agent for purposes of attributing its forum-related contacts to the parent if the subsidiary "performs services that are `sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" Doe, 248 F.3d at 928 (quoting Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994)). The ultimate inquiry is whether *1135 the subsidiary's presence in the forum "substitutes" for its parent's presence. Id. at 928-29 (quotation omitted).
Where the parent is merely a holding company, the subsidiary's forumrelated contacts are not done as the parent's agent because the holding company "could simply hold another type of subsidiary" as an investment and thus the subsidiary conducts business not as the parent's agent but as its investment. Id. at 929. "Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries." Id. (quotation omitted). The inquiry as to whether a subsidiary is its parent's general agent in the forum is "a pragmatic one." Gallagher v. Mazda Motor of Am., Inc., 781 F.Supp. 1079, 1085 n. 10 (E.D.Pa.1992).
For example, where a Japanese parent company was engaged in the manufacture of watches, its subsidiaries that acted as its sole sales agents in America were "almost by definition ... doing for their parent what their parent would otherwise have to do on its own." Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd., 508 F.Supp. 1322, 1342 (E.D.N.Y.1981). The Bulova court thus attributed the subsidiaries' contacts to the parent company. Id.; see also Chan, 39 F.3d at 1405-06 (remanding to the district court for additional findings of fact regarding agency where the German parent corporation owned and operated cruise ships and its local subsidiary marketed cruises and chartered cruise ships and sold the cruise ticket to the plaintiffs out of which the claims arose); Modesto City Schs. v. Riso Kagaku Corp., 157 F.Supp.2d 1128, 1135 (E.D.Cal.2001) (holding subsidiary was parent's agent for personal jurisdiction purposes where subsidiary acted as sole conduit for marketing and selling parent's products in the United States).
In contrast, where the parent company owned a subsidiary mining company's stock but did not itself engage in the business of gold mining, imputing the subsidiary's forum contacts to the parent was not appropriate. Sonora Diamond Corp. v. Superior Court, 83 Cal.App.4th 523, 99 Cal.Rptr.2d 824, 840-41 (2000). As the Sonora Diamond court explained, had the parent company owned "the rights to the gold and used Sonora Mining as the operating and marketing entity," then perhaps general jurisdiction over the parent company would be appropriate because under those circumstances the parent company "could not reap the benefits of its rights unless it or someone else removed and sold the ore." Id. But where the parent simply held the mining company as an investment, the subsidiary's forum-related contacts could not be imputed to the parent company. Id.
Likewise, in Doe, the Ninth Circuit concluded a foreign company's subsidiaries were not its general agents in California because the plaintiffs presented no evidence that in the absence of the California subsidiaries' involvement in petrochemical and chemical operations, the parent would have conducted and controlled those operations. Doe, 248 F.3d at 929. The Court reached this conclusion even though the parent company issued consolidated reporting, referred to a subsidiary in an annual report as its "US unit," and stated that use of the subsidiary "would enable it to expand its marketing network and produce higher value-added specialty products in the United States." Id.
Plaintiffs have failed to establish a prima facie case that RES was REI's general agent in Wisconsin. REI's business is not purely as a holding company in the sense that it does not passively hold stock *1136 in companies from an unrelated range of businesses. REI (then RRI) has described itself as a "provider of electricity and energy services with a focus on the competitive segments of the electric power industry in the United States and Europe." (Sealed App., Ex. K at REILJ009826.) REI describes its business as acquiring, developing, and operating electric power generation facilities; trading and marketing power, natural gas, and other energy-related commodities; and providing retail electric services in Texas. (Id.) REI has asserted in public filings that its 
trading, marketing, and risk management skills complement [its] generation positions. The combination provides greater scale and skill associated with the management of our fuel and power positions, sophisticated commercial insights and an understanding of the key regions in which we participate, and a wider range of ways in which we participate in the market and are able to meet customer needs.
(Id.)
In practice, REI itself does not perform these activities, but, as Jines stated in his deposition, REI "holds the shares of the different subsidiaries that are actually engaged in the different business operations of [REI]." (Sealed App., Ex. D at 129-30.) Among those business operations was REI's "wholesale" group, which included a variety of subsidiaries involved in wholesale-related activities, including RES's natural gas-related activities. (Id. at 285-86.)
Although REI identifies natural gas trading and marketing as one of its business lines, Plaintiffs have not established that RES's sales of natural gas in Wisconsin were sufficiently important to REI that if RES did not make the sales in Wisconsin, REI would have done so itself. As the California Court of Appeal found in evaluating this same question involving a similar lawsuit against REI and RES in California, "[t]his portion of the energy business appears to be sufficiently fragmentary so that [REI] could have operated without the assistance of RES." Reliant Energy, Inc. v. Superior Court, No. D049988, 2007 WL 4329488, at *18 (Cal.Ct. App.2007) (unpublished). Further, the fact that REI subsequently ceased "proprietary trading activities" due to a significant trading loss arising from "the extreme volatility in natural gas prices" suggests that RES's trading activities were not sufficiently important to REI that it would perform the activities itself if RES did not do so on its behalf. (Sealed App., Ex. G.)
Moreover, Plaintiffs have presented no evidence that RES's natural gas sales in Wisconsin in particular were sufficiently important to REI's business that REI would have performed the sales in Wisconsin itself absent its subsidiary's representation in the forum. See Modesto City Schs., 157 F.Supp.2d at 1135 (noting twenty percent of parent's products were sold through subsidiary which acted as parent's "sole conduit for marketing and selling its products in the United States"); Bulova Watch Co., Inc., 508 F.Supp. at 1344 (noting that sixty percent of parent's products were sold as exports and the United States was the parent company's largest export market through its New York subsidiaries' sales in the United States). Consequently, Plaintiffs have not shown that RES's Wisconsin natural gas sales played a significant role in REI's "`organizational life'" such that it acted as a substitute for REI in the forum. Bulova Watch Co., Inc., 508 F.Supp. at 1344.
The Court acknowledges that the California Court of Appeal upheld a state trial court's ruling that RES was REI's agent *1137 in California for natural gas trading activity during the relevant time period. Reliant Energy, Inc., 2007 WL 4329488, at *17. Although arising out of the same factual background and involving the same parent and subsidiary, the ruling is distinguishable on several grounds. The evidence presented to the California state court indicated REI had many more significant contacts with California than the single contact REI had with Wisconsin as reflected in the evidence before this Court. According to the evidence in Reliant, REI owned another subsidiary that had purchased natural-gas-fueled power plants located in California. Id. at *2. Additionally, REI obtained a certificate of qualification to do business and designated an agent for service of process in California, acted as guarantor on seven agreements between RES and California utilities, engaged in a marketing campaign in the state, subleased a small office in Sacramento which was used by a lobbyist, and employed an individual who allegedly engaged in illegal churning and wash trades in California. Id. at *3-4.
In accord with this Court's ruling, the California Court of Appeal specifically rejected RES was REI's agent under the same test the Ninth Circuit employs to determine whether a subsidiary is its parent's agent for personal jurisdiction purposes. Compare id. at *17-18, with Doe, 248 F.3d at 928. The California Court of Appeal referred to this test as the "representative services doctrine." Reliant Energy, Inc., 2007 WL 4329488, at *17-18. While finding RES was not REI's agent under the representative services doctrine, the Reliant court concluded RES was REI's agent in California under general agency principles based on REI's control over RES. Id. at *15-17. Although not calling it the "representative services doctrine," the Ninth Circuit has set forth that test as the applicable one for due process purposes. The California Court of Appeal's reference to other agency principles goes beyond the applicable agency test for exercising personal jurisdiction consistent with due process as set forth in controlling precedent for this Court.
Moreover, in making its finding under general agency principles, the California Court of Appeal relied on evidence not presented to this Court and not relevant to REI's contacts with Wisconsin. For example, the Reliant court considered the fact that RES made a daily report to REI of the California power plant's hedging activities, "regarding the coordination of power generation and supply of natural gas," and RES's trading activities impacted that supply of natural gas. Id. at *16. Additionally, evidence in the record permitted an inference that the employee who allegedly engaged in wash trades and churning in California was an REI (then RRI) employee. Id.
The California Court of Appeal also found REI's setting and raising of overall limits such as VAR to be significant evidence of REI's daily control of RES. However, as explained above, the evidence before this Court indicates REI sets overall limits but does not involve itself in RES's day-to-day decisions as to what actions to take within those limits. That RES violated those limits and requested a higher limit, to which REI agreed, is not evidence of day-to-day control. It is evidence of a change in the overall limit under which RES was to perform its day-to-day operations.
To the extent the setting and changing of VAR and other limits constitutes day-to-day control, Plaintiffs have not demonstrated that REI's setting or altering of overall limits on any metric constituted day-to-day interference with RES's sales in Wisconsin. Plaintiffs have presented no evidence that REI's oversight impacted RES's daily decisions regarding whether, when, to whom, in what *1138 volume, or at what price RES decided to sell natural gas in Wisconsin. While daily oversight of trading activities may have been significant in the Reliant case where an employee of REI or one of its subsidiaries allegedly engaged in illegal trading activity in California, REI's daily oversight mechanisms as presented to this Court do not suggest a significant level of control over RES's Wisconsin sales activity. Because Plaintiffs have not established a prima facie case that RES acted as REI's agent in Wisconsin, the Court will not attribute RES's Wisconsin contacts to REI on this basis.[6]

C. Conspiracy Theory
The conspiracy theory of personal jurisdiction is based on the premise that a conspirator's acts in furtherance of a conspiracy are attributable to the other members of the conspiracy. Textor v. Bd. of Regents of N. Ill. Univ., 711 F.2d 1387, 1392 (7th Cir.1983). Consequently, some courts attribute a conspirator's in-forum acts to his co-conspirators for personal jurisdiction purposes.
The Ninth Circuit has not expressly accepted or rejected the conspiracy theory of personal jurisdiction. In its only published opinion addressing the issue, the Ninth Circuit noted that the two district court opinions upon which the plaintiff relied required the plaintiff either to allege specific overt acts in the forum state that furthered the conspiracy, or to allege substantial acts in furtherance of the conspiracy in the forum and that the co-conspirator knew or should have known his co-conspirator would perform those acts in the forum. Underwager v. Channel 9 Australia, 69 F.3d 361, 364 (9th Cir.1995). Without expressing any opinion on the validity of the conspiracy theory of personal jurisdiction, the Ninth Circuit concluded the plaintiff alleged no facts suggesting a conspiracy and failed to dispute the defendants' claims that they did not know certain acts would take place in the forum. Id. The Court therefore affirmed the district court's dismissal for lack of personal jurisdiction. Id.
Since this case, the Ninth Circuit has noted that "a great deal of doubt" surrounds the conspiracy theory's legitimacy. Chirila v. Conforte, 47 Fed.Appx. 838, 842 (9th Cir.2002) (unpublished). Some courts have adopted it.[7] Others have rejected its *1139 application as inconsistent with due process.[8] Still others follow the Ninth Circuit's lead in Underwager and decline to address whether the theory comports with due process, but find the plaintiff failed to meet the test even if it applied. See Melea, Ltd. v. Jawer SA, 511 F.3d 1060, 1070 (10th Cir.2007); Glaros v. Perse, 628 F.2d 679, 682 (1st Cir.1980).
Although not in the personal jurisdiction context, the Ninth Circuit has rejected a similar conspiracy theory in the venue context. Piedmont Label Co. v. Sun Garden Packing Co., 598 F.2d 491 (9th Cir.1979) (rejecting conspiracy theory of venue). In Piedmont, the Ninth Circuit considered whether venue in an antitrust action could be based "solely on allegations that a defendant was a member of a conspiracy and that a co-conspirator performed acts in the forum district." Id. at 492. The plaintiff argued that because a conspirator committed acts in the venue and a conspirator acts as his co-conspirator's agent, a defendant who otherwise had not conducted business in the forum could be said to have an agent and "transacted business" there under the relevant venue statutes. Id. at 492-93. Based on United States Supreme Court dictum casting doubt on the conspiracy theory of venue under the Clayton Act, the Ninth Circuit concluded that deeming a conspirator an agent of his co-conspirators would expand the venue statute beyond what Congress contemplated. Id. at 494-95.
Piedmont is of limited value to the question in this case, as Piedmont was focused on the plaintiff's attempt to expand a specific venue statute contrary to congressional intent. To the extent Piedmont cautions against freely attributing one party's acts to another, existing personal jurisdiction law already provides that this Court must examine each defendant's contacts with the forum individually. Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1130.
It is unclear whether and under what conditions the Ninth Circuit would find it consistent with due process to attribute a conspirator's forum-related contacts to his co-conspirators for personal jurisdiction purposes. However, general due process considerations still would apply to outline the contours of a conspiracy theory of personal jurisdiction, if one is to exist at all.
Under these principles, the Court concludes that to the extent a conspiracy theory of personal jurisdiction is viable, it must be limited to the context of specific jurisdiction and cannot support general jurisdiction. To hold otherwise would create satellite litigation regarding conspiracies completely unrelated to the underlying claims simply to establish personal jurisdiction. Such a trial-within-a-trial situation based on an already tenuous basis to attribute a third party's contacts to a defendant to support personal jurisdiction is untenable.
Within the specific jurisdiction analysis, a plaintiff must establish the defendant purposefully availed himself of the forum. An allegation that a particular defendant *1140 caused or contributed to an effect in the forum state, by itself, is insufficient, even if it is foreseeable that the defendant's conduct would have an effect in the forum. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 296, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The defendant, not his co-conspirator, must choose to direct his activities at the forum in causing the effect in the forum. Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."). Consequently, a co-conspirator's activity directed at the forum, even if in furtherance of a conspiracy of which the foreign defendant is a member, cannot constitute purposeful direction at the forum by the foreign defendant. The Court thus concludes that allegations of specific acts committed by a co-conspirator in the forum in furtherance of the conspiracy, alone, are insufficient to establish minimum contacts by a defendant who otherwise has no contacts with the forum.
Additionally, a "foreseeable effect" in the forum state is inadequate to show the purposeful direction necessary to establish specific jurisdiction. Pebble Beach, 453 F.3d at 1155. Consequently, a defendant's mere awareness or ability to foresee in-forum effects from his out-offorum conduct is insufficient to establish minimum contacts with the forum. Rather, under established Ninth Circuit law regarding specific jurisdiction, a foreign defendant expressly aims his conduct at the forum when he is alleged to have engaged in wrongful conduct "individually targeting a known forum resident." Bancroft, 223 F.3d at 1087. The Court thus concludes that if a conspiracy theory of jurisdiction is viable, a plaintiff must set forth non-conclusory allegations that the defendant was a member of a conspiracy, that the defendant's or his co-conspirator's acts in furtherance of the conspiracy caused harm in the forum, and that the conspiracy individually targeted a known forum resident.
Absent requiring this sort of purposeful direction at the forum, the conspiracy theory of personal jurisdiction "threatens to confuse the standards applicable to personal jurisdiction and those applicable to liability." Melea, Ltd., 511 F.3d at 1070. Personal jurisdiction is more restrictive than the scope of liability on a particular claim. A state "does not acquire [personal] jurisdiction by being the `center of gravity' of the controversy, or the most convenient location for litigation." Hanson, 357 U.S. at 254, 78 S.Ct. 1228. That a particular court lacks personal jurisdiction over a member of a conspiracy does not immunize the defendant from liability, it merely affects in what forum the plaintiff may seek to enforce that liability. Ploense, 317 Ill.Dec. 773, 882 N.E.2d at 668.
Here, Plaintiffs' SAC does not allege REI purposefully availed itself of Wisconsin by individually targeting known Wisconsin residents. Rather, the SAC alleges a nationwide conspiracy to manipulate natural gas prices resulting in inflated prices generally, including in Wisconsin. The mere likelihood that the price manipulation allegedly occurring in other states foreseeably would affect natural gas prices in Wisconsin does not amount to purposeful direction at Wisconsin. Other conspirators, not REI, chose to sell natural gas at allegedly inflated prices to customers in Wisconsin. The SAC does not allege the conspirators made an agreement specifically regarding Wisconsin or its residents. While other alleged conspirators such as RES may have purposefully directed their conduct at known Wisconsin residents, the *1141 SAC contains no non-conclusory allegations that REI purposefully did so.[9]
Plaintiffs argue that Wisconsin has expanded its antitrust laws to reach conduct which impacts Wisconsin "even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state." Olstad v. Microsoft Corp., 284 Wis.2d 224, 700 N.W.2d 139, 158 (2005). Plaintiffs thus contend Wisconsin must have meant to acquire personal jurisdiction over foreign antitrust co-conspirators whose out-of-forum acts impact Wisconsin.
This confuses liability with personal jurisdiction. While REI may be liable under Wisconsin antitrust law for its alleged illegal conduct, that does not automatically equate to Wisconsin having personal jurisdiction over REI. If Wisconsin does not have personal jurisdiction over a particular defendant, it must depend on other states to enforce its antitrust laws. Even if Wisconsin would adopt the conspiracy theory of personal jurisdiction for purposes of its long-arm statute, the exercise of personal jurisdiction by this Court still must comport with due process of law.
Moreover, Plaintiffs have failed to present evidence that REI was a member of any conspiracy directed at known Wisconsin targets. Although Plaintiffs contend they were not permitted to conduct discovery on the conspiracy issue, and thus the Court should not allow REI to argue no evidence of conspiracy exists, REI answered Plaintiffs' discovery on the issue of conspiracy as it relates to REI. REI had no documents related to communications between REI and the other Defendants about natural gas prices and had no documents in which REI directed a subsidiary's communications, price reporting, or trading. (Partial Tr. (Doc. # 1128) at 49-50.) REI objected to the extent that Plaintiffs sought every communication made by its subsidiary, RES, to other alleged co-conspirators. Such communications would not demonstrate REI's participation in a conspiracy, and thus would not demonstrate REI was a member of a conspiracy directed at Wisconsin.
Plaintiffs have not convinced the Court that further discovery would produce a different result. The Court therefore will decline Plaintiffs' request to defer the personal jurisdiction issue to be resolved with the merits. Because Plaintiffs have failed to allege Defendant REI purposefully directed its activities at a known forum resident, and because Plaintiffs have failed to present any evidence of REI's participation in any such conspiracy, the Court will grant Defendant REI's motion to dismiss for lack of personal jurisdiction.
The Court will not attribute RES's contacts with the forum to REI, and REI has no contacts of its own sufficient to support personal jurisdiction. The Court therefore will grant REI's motion to dismiss for lack of personal jurisdiction.

III. CONCLUSION
IT IS THEREFORE ORDERED that Defendant Reliant Energy, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. # 869) is hereby GRANTED. Defendant Reliant Energy, Inc. is hereby dismissed from this action for lack of personal jurisdiction.
NOTES
[1] Document numbers refer to the base file, 2:03-CV-01431-PMP-PAL, unless otherwise noted.
[2] Plaintiffs' Second Amended Complaint is located at docket number 847 in the base file. Plaintiffs filed the Corrected Second Amended Complaint only in the individual case file.
[3] "Mark-to-market" means the value of a contract relative to current market prices. (Sealed App., Ex. N at 128.)
[4] The Court will assume that if RES's forumrelated acts are attributable to REI, the Wisconsin long-arm statute is satisfied.
[5] Wisconsin utilizes similar principles. In Wisconsin, the party attempting to pierce the corporate veil must show the subsidiary corporation "has no separate existence of its own and is the mere instrumentality of the shareholder and the corporate form is used to evade an obligation, to gain an unjust advantage or to commit an injustice." Wiebke v. Richardson & Sons, Inc., 83 Wis.2d 359, 265 N.W.2d 571, 573 (1978). To the extent Wisconsin would look to the law of the state of incorporation to determine alter ego status, Delaware has similar requirements. See Maloney-Refaie v. Bridge at Sch., Inc., 958 A.2d 871, 881 (Del.Ch.2008); In re Sunstates Corp. Shareholder Litig., 788 A.2d 530, 534 (Del.Ch. 2001).
[6] The result would be the same under general Wisconsin agency law. In Wisconsin, an express agency relationship exists "only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." Johnson v. Minn. Mut. Life Ins. Co., 151 Wis.2d 741, 445 N.W.2d 736, 738 (Wis.Ct. App.1989) (quotation omitted). Wisconsin also recognizes apparent agency upon a showing of "(1) acts by the agent or principal justifying belief in the agency; (2) knowledge of such acts by the parties sought to be held; and (3) reliance on the apparent agency consistent with ordinary care and practice." Id. at 739.

Here, Plaintiffs have presented no evidence of any express manifestation from REI to RES that RES may act as REI's agent in Wisconsin. As to apparent agency, Plaintiffs have presented evidence that REI permitted RES to use the "Reliant" name and logo in marketing natural gas in Wisconsin. However, Plaintiffs have presented no evidence that anyone relied on an apparent agency relationship between REI and RES. Plaintiffs do not identify any evidence in the record supporting such reliance. None of the affiants who purchased natural gas from RES averred that they relied upon RES's status as REI's apparent agent.
[7] See, e.g., Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1031-32 (D.C.Cir.1997) (applying theory but finding no personal jurisdiction); Textor, 711 F.2d at 1392-93 (applying Illinois long-arm statute); Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc., 42 F.Supp.2d 423, 434 (D.Del.1999); Santana Prods., Inc. v. Bobrick Washroom Equip., 14 F.Supp.2d 710, 718 (M.D.Pa.1998); see also Roy v. Brahmbhatt, No. 07-5082(PGS), 2008 WL 5054096, at *7 (D.N.J.2008) (unpublished) (collecting cases).
[8] See, e.g., Silver Valley Partners, LLC v. De Motte, 400 F.Supp.2d 1262, 1268 (W.D.Wash. 2005); Karsten Mfg. Corp. v. U.S. Golf Ass'n, 728 F.Supp. 1429, 1434 (D.Ariz.1990); Kipperman v. McCone, 422 F.Supp. 860, 873 n. 14 (N.D.Cal.1976); Ploense v. Electrolux Home Prods., Inc., 377 Ill.App.3d 1091, 317 Ill.Dec. 773, 882 N.E.2d 653, 666-68 (2007); Mansour v. Super. Ct. of Orange County, 38 Cal.App.4th 1750, 46 Cal.Rptr.2d 191, 196-98 (1995); Hewitt v. Hewitt, 78 Wash.App. 447, 896 P.2d 1312, 1315-16 (1995); Nat'l Indus. Sand Ass'n v. Gibson, 897 S.W.2d 769, 773 (Tex.1995); see also Roy, 2008 WL 5054096, at *7 (collecting cases).
[9] The SAC contains only one allegation regarding any direction towards Wisconsin: "Reliant Energy, Inc., f/k/a Reliant Resources, Inc.'s actions were intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period." (Corrected Second Am. Compl. at 35-36.)